1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   JOHN ANTHONY VELLA,                    )   Case No.: 1:12-cv-01402-LJO-SAB (PC)
                                            )
12               Plaintiff,                 )   FINDINGS AND RECOMMENDATION
                                            )   REGARDING DEFENDANTS' MOTIONS FOR
13        v.                                )   SUMMARY JUDGMENT
                                            )
14   EDGAR CLARK, et al.,                   )   [ECF Nos. 35, 39]
                                            )
15               Defendants.               )
                                            )
16   _____)

17        Plaintiff John Anthony Vella is appearing pro se and in forma pauperis in this civil rights

18   action pursuant to 42 U.S.C. § 1983.

19                                  **I.**

20                          **PROCEDURAL HISTORY**

21        This action is proceeding on Plaintiff's claim of deliberate indifference to a serious medical

22   need in violation of Eighth Amendment against Defendants Dr. Edgar Clark, Dr. Young Paik, and

23   Licensed Vocational Nurse (LVN) M. Gray.

24   ///

25   ///

26   ///

27   ///

28   ///

                                    1

On February 13, 2015, Defendants Dr. Clark and Gray filed a motion for summary judgment. On April 17, 2015, Plaintiff filed an opposition to Defendants' motion.[1]  Defendants Clark and Gray filed a reply on April 24, 2015.

Defendant Paik filed a separate motion for summary judgment on April 8, 2015.  Plaintiff filed an opposition to Defendant Paik's motion on June 4, 2015, and Defendant filed a reply on June 11, 2015, along with separate objections to the evidence submitted by Plaintiff in his opposition.

Because both motions for summary judgment relate to the treatment of Plaintiff foot injury, this Findings and Recommendation combines the two motions because of the substantial overlap in facts and issues.

## I.

## DISCUSSION

### A.      Allegations Set Forth in Complaint

On September 23, 2010, Plaintiff inadvertently rammed his left foot on the solid concrete block corner of the prison cell bunk in which he was assigned resulting in a broken toe.

On this same date, Plaintiff was examined by Licensed Vocational Nurse (LVN) Tassie who requested that Plaintiff be sent to the Facility Emergency Room.

The on-call doctor at John D. Klarich Hospital inspected Plaintiff's left foot and determined the severity of the injury was beyond the capabilities of the hospital to treat.  Therefore, at approximately 9:30 p.m., it was ordered for Plaintiff to be sent to the emergency room at the San Joaquin Valley Hospital (SJVH) in Bakersfield, California.

On September 24, 2010, at approximately 3:24 a.m., Plaintiff arrived and was admitted at SJVH and evaluated by Dr. Dale D. Stewart.  Dr. Stewart ordered a high resolution x-ray of Plaintiff's left foot, which revealed that Plaintiff suffered a displaced radial fracture of the left fifth medicarpal. Plaintiff's foot was so impacted that it had broken a joint, which caused severe dislocation. Plaintiff's dislocation was so severe that his left toe was hanging off the side of his foot.

---

[1] Plaintiff's opposition and proof of service is dated April 2, 2015, and under the mailbox rule is presumed filed on that date.  Houston v. Lack, 487 U.S. 266, 270 (1988).

1    On September 24, 2010, at approximately 4:59 a.m., Dr. Stewart, set Plaintiff's break and

2  massaged the bone back into place, issued pain medication, and released Plaintiff back to the facility.

3  Dr. Stewart also ordered the use of a wheel chair, not to walk on the foot, and to return at a later date

4  for placement of a cast once the swelling went down.

5    Upon Plaintiff's return to the prison facility, officers forcibly took Plaintiff's assigned wheel

6  chair, and forced him to walk, unaided by crutches, walker, or personal assistance, to enter Plaintiff's

7  assigned cell.  Despite Plaintiff's protest, his request for use of a mobility device was unanswered.

8    Plaintiff's mobility issues persisted for the next six to seven days, despite Plaintiff's requests to

9  correctional and medical staff of his need for a mobility device.

10    LVN D. Tassie, made attempts on behalf of Plaintiff to obtain a medical mobility device.  She

11  contacted her supervisor on two separate occasions, and the supervisor failed in her duties.

12    On September 29, 2010 through October 13, 2010, Plaintiff was forced to walk on his broken

13  foot, due to not have a mobility device which resulted in further injury.

14    On September 30, 2010, Plaintiff was examined by Family Nurse Practioner (FNP), M. Dhah,

15  who prescribed crutches.  However, Chief Medical Officer (CMO) Edgar Clark, refused to authorize

16  the order until October 13, 2010.  At that time, Plaintiff was ordered to pay $16.75 for a pair of used,

17  damages, and unsanitary crutches.  LVN, Jarrod Robbins, protested to CMO Clark, the issuance and

18  use of the crutches because of the poor condition.

19    On October 13, 2010, correctional officer Hamilton, also protected the assignment of the used

20  crutches, and provided Plaintiff with use of a wheel chair.

21    Because Plaintiff was forced to walk on his broken foot, further injury resulted to his foot

22  affecting the healing process causing a deformity in his foot.

23    On October 20, 2010, Dr. Leiberstein diagnosed Plaintiff's foot and immediately ordered him

24  to be transported to the facility hospital via a wheel chair.  An x-ray was conducted and examined by

25  Dr. Ulit which revealed that Plaintiff's foot was healing wrong.

26    Within a couple days after the x-ray, Plaintiff was examined by Orthopedic Specialist, Dr.

27  Young Paik, who ordered Plaintiff to "stay off" the broken and injured foot.  He ordered pain

28

3

1   medication and emergency surgery in order to re-break the foot to perform a flangial reduction to the

2   fifth medicarpal and joint, and place a rod in the toe.

3       In December 2010, Dr. Young Paik made his first attempt for corrective treatment of Plaintiff's

4   broken foot.  However, the procedure was cancelled by Dr. Paik's office.

5       On January 5, 2011, Plaintiff was transported to Mercy Hospital in Bakersfield, California.  Dr.

6   Young Paik performed a second operation on Plaintiff's foot.  Dr. Liberstein and Dr. Ulit ordered

7   post-surgery pain medication in the form of Tylenol and Morphine.

8       On January 20, 2011, because Plaintiff did not have access to a mobility device, he fell while

9   in the toilet area of his cell.  The cast became wedged between the metal toilet and concrete wall,

10   resulting in Plaintiff losing balance and falling hard on the concrete floor, causing re-injury of his foot.

11       On this same day, Plaintiff was examined by LVN Osunde, who merely noted swelling at the

12   knee and blood in the cast.  Osunde notified CMO Edgar Clark, who refused to order Plaintiff's

13   transport to the emergency room.

14       On January 21, 2011, Plaintiff was interviewed by Dr. Norman and was ordered to be sent to

15   the emergency room.  On this same day, an x-ray was conducted by Dr. Kim and Dr. Ulit.  Both

16   doctors observed that Plaintiff bent the metal rod in his foot and tore the skin around the entry spot

17   causing bleeding profusely.  Neither doctors could provide Plaintiff any treatment other than the pain

18   medication already prescribed, as it was outside their scope of treatment.

19       On January 24, 2011, Plaintiff was again taken to the emergency room and examined by Dr.

20   Young Paik.  Dr. Paik removed the cast and removed the bent rod.  Dr. Paik ordered that Plaintiff be

21   returned for complete cast removal and a possible replacement cast to avoid infection.  However, the

22   medical order by Dr. Paik was never honored by prison staff.

23       On January 26, 2011, CMO Edgar Clark ordered LVN Gray to refuse to provide Plaintiff the

24   pain medication that was prescribed two days prior.

25   ///

26   ///

27   ///

28   ///

4

On February 7, 2011, Dr. Noman issued an urgent "cast removal order" and contacted CMO Clark and Dr. McCabe for assistance.  The same order was issued again by Dr. Norman two days later on February 9, 2011.

On February 16, 2011, FNP Kaur submitted an order to remove the cast because the prior two orders were denied.

On February 22, 2011, FNP Dhah, submitted an order to remove the cast.

On March 7, 2011, Dr. Noman again submitted an "urgent" order to remove the cast.

On March 14, 2011, Plaintiff was transported to Dr. Paik's office, approximately 48 days after the initial order was issued.  Due to Dr. Paik's apparent agitation and frustration with prison and medical staff, he quickly removed the cast and then stated "leave, that is all I'm going to do, we are now done here take him back to Corcoran Hospital for treatment."  Dr. Paik refused to inspect the wound and injury for infection, and failed to clean the wound despite the horrible smell.

When Plaintiff was transported back to the prison he was placed directly into his cell without examination by any medical staff despite the apparent infection on his foot.

On March 21, 20112, Plaintiff was examined by FNP Dhah who prescribed Ciproflaxen to treat the infection.

On April 11, 2011, Plaintiff was reviewed by Dr. Bob Barr, who noted the severe infection on Plaintiff's foot and contacted CMO Clark as to Plaintiff's medical needs.  Dr. Barr subsequently contacted CMO Clark again on April 14, and April 20, 2011.

CMO Clark cancelled any and all further treatment for Plaintiff, despite Dr. Barr's notation on September 15, 2011, describing "deep lesions on plaintiff's foot and the draining of puss."  Plaintiff also had rotting on the flesh due to the failure to treat the injuries which has resulted in permanent damage and severe pain in the foot.

Plaintiff was reviewed by Dr. Williams, at U.C. Davis Medical Center, who listed Plaintiff's injury and pain as 100 percent permanent.

Plaintiff was also reviewed by Dr. Deutinger and Dr. Ruff, pain management specialists, and both noted that due to the failure to properly treat Plaintiff's injury, resulted in permanent pain and the need for permanent pain management care and medication.

On January 26, 2012, Plaintiff was reviewed by the prison's pain management committee which consisted of Doctors Ruff, Barr, Wang and Clark, who placed Plaintiff on pain management due to the severity of his foot injury.  However, Plaintiff is still in need of pain management therapy.

**B.     Defendants' Statement of Undisputed Facts[2]**

1.     On August 26, 2010, Plaintiff, John Anthony Vella, was seen by California State Prison-Corcoran ("COR") Nurse Practitioners Dhah and Bondoc.  FNP Bondoc took Plaintiff off his pain medication, which he claims was prescribed by the COR pain committee for his right wrist injury.

2.     On August 29, 2010, Plaintiff filed a 602 health care appeal demanding to be put back on his pain medication.

3.     On September 23, 2010, Plaintiff hit his left foot on a concrete corner of his cell, fracturing a bone in his left (pinky) fifth toe.

4.     Plaintiff was taken to the COR emergency room, where he was seen by Dr. Wang.  Dr. Wang prescribed him Tylenol 3 for pain and ordered him to be taken to the Emergency Room at San Joaquin Community Hospital for an X-ray and orthopedic consult.

5.     Plaintiff was seen and treated by Dr. Dale Stewart on September 24, 2010, at the San Joaquin Community Hospital in Bakersfield.

6.     Dr. Stewart reviewed an X-ray taken of Plaintiff's left foot and determined Plaintiff had a "fracture the proximal end of the distal phalanx of the left fifth toe," but that "this toe has an old deformity at the metarsal phalangeal joint."

7.     After giving Plaintiff Vicodin for pain and taping his fifth and fourth toes together, Dr. Stewart instructed Plaintiff to take Vicodin for pain every six hours and to leave his toes taped together for 3 weeks and that the "toes should be re-taped every 3 days and always with padding in between."

///

///

---

[2] This section includes the statement of undisputed facts submitted by both Defendants separate motions for summary judgment, where not placed in dispute by Plaintiff.

8. After he returned to COR, Plaintiff submitted a Health Care Services Request Form on September 24, 2010 stating "I have not been provided a wheelchair. I cannot use crutches. RN for 4b4L checked there is no order."

9. Plaintiff was not allowed to bring a wheelchair into his cell, because it could not fit or be used in there.

10. On September 29, 2010, Plaintiff was seen by NP Dhah in response to his wheelchair request and also his 602 appeal wheelchair, but also in response to his 602 appeal related to the discontinuance of his pain medication that he filed August 29, 2010.

11. NP Dhah ordered crutches and continued the prescription for Tylenol 3 for his left toe pain for 10 days.

12. Later that same day, Plaintiff was offered crutches but refused them, stating "I'm not going to pay for a medical device that is a requirement, I'll just 602 it."

13. Dr. Clark does not recall being made aware of Plaintiff's toe injury or of the request for a mobility aid device during the period September 20, 2010 to October 13, 2010.

14. Plaintiff does not know when Dr. Clark might have received the request for crutches, if he ever did.

15. On October 13, 2010, after the ten day Tylenol 3 prescription ran out, Plaintiff complained that he had dislocated his toe again two days after returning from the San Joaquin Community Hospital and that he was in pain and his toes had become crossed.

16. He was seen by a yard doctor. Dr. Liberstein who noted there were no X-ray of his toe available to review, and so he sent Plaintiff to COR's Acute Care Hospital (ER) "for a partial foot cast to keep bones in place during healing process."

17. Dr. Liberstein also noted that Plaintiff "needs to have solid non-flexible sole" shoes, which are typically not prescribed for someone who needs crutches to walk.[3]

18. The nurse's orders indicated that Plaintiff was able to "ambulate," meaning he was sent to the ER without a wheelchair, crutches or any mobility aid.[4]

---

[3] Plaintiff attempts to dispute this fact by stating that Dr. Liberstein ordered a partial cast. Plaintiff's statement does not place this fact in dispute, as statement number 17 clearly states that Dr. Liberstein sent Plaintiff for a partial foot cast.

19.     After examining him in the ER later that day, Dr. Ulit submitted a physician's request for services to the CMO to approve an outside orthopedic specialist's further examination of Plaintiff's toe injury.

20.      Dr. Ulit also prescribed Tylenol 3 for the pain, ordered an X-ray of his left foot.  He also prescribed Plaintiff hard sole shoes.

21.     An X-ray was taken of Plaintiff's left foot on October 14, 2010 noting no evidence of acute fracture or bony erosion, and that there was no soft tissue swelling.

22.     On October 15, 2010, Defendant Dr. Edgar Clark, who was the acting Chief Medical Officer at the time, approved Dr. Ulit's request for an orthopedic consult with Dr. Young Paik.

23.     Plaintiff saw Defendant Dr. Young Paik, an orthopedic surgeon with the Pacific Orthopedic Medical Group in Bakersfield via telemedicine on October 22, 2010, (for the first time).

24.     Dr. Paik noted that Plaintiff's X-ray showed a dislocated of the metatarsophalangeal ("MP") joint of the fifth left toe, but also that Plaintiff had multiple claw toe deformities and other toes, not just the fifth left toe.  Such deformities were of unknown causes ("unknown etiology"), unrelated to any recent acute traumatic injury.[5]

25.     During this October 22, 2010 telemedicine visit with Plaintiff, Dr. Paik noted that a physical examination of Plaintiff's left foot revealed a moderate degree of soft tissue swelling as well as a "claw toe" deformity of the left metatarsal with lateral deviation.

26.     Dr. Paik's assessment during the October 22, 2010 visit was that the patient was status post dislocation and reduction of the 5th MP joint of the fifth toe on the left foot, was experiencing recurrent subluxation of that joint, and that the patient had chronic foot pain and multiple claw toe deformities of an unknown etiology.

27.     Dr. Paik recommended open reduction internal fixation ("ORIF") with K-Wires, which is a procedure used to fix Plaintiff's broken fifth left toe using K-Wires to hold the bones in place

---

[4] Plaintiff attempts to dispute this statement, in part, by referencing instances on different occasions when he used a wheelchair.

[5] Plaintiff's attempt to dispute this fact is unfounded as there is no support to his claim that Dr. Paik attributed the claw toe deformities, other than the fifth left toe, to the prior injury.

while healing.  He also recommended a partial phalangectomy, a procedure to remove excess partial phalanges bones in the toes, to address Plaintiff's other preexisting claw toe deformities.

28.     After the telemedicine consult with Dr. Paik Plaintiff saw NP Dhah again on November 4, 2010, who completed a physician request for services for Dr. Paik's recommended procedures.  NP Dhah also renewed Plaintiff's Tylenol 3 pain medication twice, first for one month, then again on November 19, 2010 for two months.

29.     Dr. Clark approved Dr. Paik's recommended ORIF procedure on November 30, 2010.

30.     Due to scheduling conflicts resulting in Dr. Paik's office cancelling the first appointment, Dr. Paik did not perform the procedure until January 5, 2011, at Mercy Hospital.

31.     During the January 5, 2011 surgery, Dr. Paik performed a partial phalangectomy of the fifth toe, an anterior capsulotomy of the 5th MP joint, a lengthening of the extensor tendon of the fifth toe, and internal fixation with K-wire of the 5th MP joint followed by application of a short leg cast.

32.     No intra-operative complications were encountered by Dr. Paik.

33.     Plaintiff tolerated the January 5, 2011 procedure well and was transferred to the recovery room in satisfactory condition.

34.     When Plaintiff returned to the prison later on January 5, 2011, Dr. Ulit completed a chrono for crutches for Plaintiff, a request for a follow up with Dr. Paik in two weeks, and also prescribed.

35.     When Plaintiff was offered crutches on January 10, 2011 Plaintiff refused them, stating "I already have a wheel chair."

36.     Dr. Clark, unaware that Plaintiff had refused the crutches, nevertheless approved Dr. Ulit's request for them on January 11, 2011.

37.     Dr. Clark also approved Dr. Ulit's request for a follow-up appointment with Dr. Paik.

38.     On January 19, 2011 Plaintiff submitted a Health Care Services request form stating "I have recently had a operation to my left foot where metal pins and other metal was put in my foot the pins are still in and my s.r. 15 morphine expires on 1-20-11 and  I am still in a lot of pain and need a med refill please."

39.     The next morning, January 20, 2011, Plaintiff complained to LVN Osunde that he had fallen during the night, resulting in a "swollen and red" knee.[6]

40.     When LVN Osunde examined him, she saw no signs of distress, that there was no redness, swelling or bleeding anywhere on his leg and his cast was intact.[7]

41.     Defs' Statement No. 42.

42.     Plaintiff was seen by a yard doctor, Dr. Noman on January 21, 2011.[8]

43.     Dr. Noman ordered an X-ray of Plaintiff's left foot.

44.     On January 24, 2011, an X-ray of Plaintiff's left foot revealed no fractures but a "mild irregularity of the articular surface of the distal phalanx" on his foot was noted.  The X-ray report also stated "no evidence of hardware failure or fracture" in the K-Wire, and that it was still in place fixing the dislocated toe.[9]

45.     The same day, Plaintiff was also seen for a follow up with Dr. Paik, who reviewed the X-ray and noted that it "reveals no internal change compared to previous x-ray film," which meant that his fifth left toe was healing properly as anticipated.

46.     During the January 24, 2011 visit, a window was cut in Plaintiff's cast so that Dr. Paik could adequately visualize the patient's surgical wound.

47.     Dr. Paik removed the K-Wires (used to hold the bones in place during the healing process) from his toe and stitches from Plaintiff's left foot cast, replaced the opening he had cut in the cast to inspect the wound, but left the cast on to continue the healing process.  There was no notation by Dr. Paik of any damage to the K-Wires.

///

---

[6] Plaintiff attempts to dispute this fact by stating that he told LVN Osburne on January 21, 2011 at 17:35 when he was referred to the RN.  However, Plaintiff's statement does not place the fact as phrased by Defendants in dispute.

[7] Plaintiff attempts to dispute this fact by stating that "redness" was noted by LVN Osburne; however, the notes and declaration by LVN Osburne support the finding that no redness was noted, and Plaintiff's interpretation and claim to the contrary does not place this fact in dispute.

[8] Plaintiff's attempt to dispute this fact by stating that RN M. Dava sent Plaintiff via wheel chair does not create a dispute of fact.

[9]  Plaintiff cannot place this fact in dispute with his own personal lay opinion.  Fed. R. Evid. 701, 702.

48.     Dr. Paik instructed Plaintiff to return to this office for another follow up evaluation where Dr. Paik could permanently remove the cast and start him on active passage range of motion exercises to alleviate the stiffness he was experiencing in his joints.

49.     Later in the day on January 24, 2011, Plaintiff was seen back at the prison by a yard doctor, A. Liberstein, who noted that Plaintiff was complaining of increased pain after Dr. Paik removed the K-wire and staples from his cast.

50.     Dr. Liberstein prescribed "morphine 15 mg" twice a day for three days (six doses).

51.     Plaintiff was to receive his first doses of morphine on the afternoon of January 24th, two additional doses for January 25th, two additional doses on January 26th, and one final dose on the morning of January 27th.

52.     LVN Gray worked in the housing unit where Plaintiff was housed in the afternoon of January 26, 2011, so she would have been responsible for dispensing the 5th dose (afternoon of January 26th).

53.     Plaintiff did not see Dr. Clark discussing his medication with LVN Gray, and according to Plaintiff, Dr. Clark was in another part of the prison.

54.     It is the LVN's responsibility and job duty to execute a physician's orders precisely and without alteration, because she does not have medical training to diagnose or prescribe treatment.

55.     As acting CMO, Dr. Clark is not responsible for knowing about every inmate patient's follow-up visit needs until it is brought to his attention by a physician through a request for health care services.

56.     On February 2, 2011, Plaintiff saw Dr. Noman for his complaint and Dr. Noman prescribed Tylenol 3.

57.     Dr. Noman also contacted Dr. Clark, who was not aware that Plaintiff had not seen Dr. Paik for his one week follow-up until Dr. Noman advised him on February 9, 2011.

58.     Dr. Clark approved the request the same day.

59.     On February 22, 2011, Plaintiff saw NP Dhah for follow-up examination.

///

///

11

60.     NP Dhah noted that Plaintiff has a pending appointment with the orthopedist but that he was still complaining of pain (more in the morning), although there was no numbness and "no other complaints."

61.     Plaintiff was given Ibuprofen and was instructed to continue with the Tylenol 3.

62.     On March 7, 2011 Plaintiff again saw NP Dhah, regarding his foot pain as well as a colonoscopy appointment.  NP Dhah noted at that point that she discussed the case in detail with Dr. Clark and that they would try to send him to Dr. Paik the following day.

63.     On March 8, 2011, Dr. Clark approved yet another urgent follow up appointment.

64**.**     Dr. Paik examined Plaintiff's foot at the follow up appointment on March 14, 2011. He noted that "the previous surgery site is healing very well without sign of infection" after removing his cast.  He stated that "[t]reatment at this time is observation.  He will perform passive stretching exercises."

65.     Plaintiff was seen later that day (on March 14, 2011) by COR medical staff who noted that he complained of pain after his cast was removed (5 on a scale of 10) but that he had pain meds ordered, and showed no signs or symptoms of acute distress.[10]

66.     On March 18, 2011, Plaintiff submitted a new Health Care Services Request Form, stating "I need a medication refill on Tylenol # 3 I get them twice a day two tablets.  Due to an injury to my left foot that required surgery.  And after the surgery the cast was left on my foot for 44 days beyond the removal date.  This has caused me a great deal of pain in the foot."  There was no mention or complaint of lesions or infections in his foot.[11]

///

///

///

///

---

[10] Plaintiff's attempt to dispute this fact by reference to an examination which took place on a different place does not place this statement of fact in dispute.  (ECF No. 42, Pl.'s Opp'n, at 45 ¶ 87.)

[11] As with the prior statement, Plaintiff attempts to dispute this fact by reference to an examination by a different medical staff on a different date (ECF No. 42, Pl.'s Opp'n at 45 ¶ 88.), which does not place this fact in dispute.

67.     On March 21, 2011, NP Dhah responded to the request, examined Plaintiff, and noted that his "left foot scar healed without signs of infection: and that there were "several abrasions to left foot without … erythema [inflammation]."[12]

68.     NP Dhah prescribed Tylenol 3 for the pain and Keflex for the abrasions.

69.     Consistent with Dr. Paik's instruction after the cast removal to have Plaintiff perform stretching exercises to alleviate the foot stiffness, Dr. Clark approved a yard doctor, Dr. Okeari's request for physical therapy on April 4, 2011.

70.     Plaintiff was scheduled to begin physical therapy with Bob Burr on April 11, 2011.

71.     However, the session could not be completed because Plaintiff complained that he was in too much pain to proceed and that he had developed an infection on his foot.

72.     Physical Therapist Burr requested that Plaintiff be reevaluated by a medical doctor for the infection before beginning his physical therapy and because Plaintiff kept complaining that he was in too much pain to proceed.

73.     Plaintiff was seen on April 25, 2011 by Dr. O. Beregovskaya for his complaints of a foot infection.

74.     On May 2, 2011 Plaintiff was seen by Nurse Practitioner G. Cherekoff, who prescribed him Tylenol 3 while his X-ray results were pending.[13]

75.     Plaintiff's X-ray findings stated "no radiographic evidence of acute fracture or osteomyelitis is identified" and that "no other significant pathology is seen."[14]

76.     On May 31, 2011, following his telemedicine examination, Dr. Williams, noted that Plaintiff's "[p]ain was out of proportion with observed findings with the patient noting that his pain

---

[12] Plaintiff attempts to dispute this fact by claiming that NP Dhah prescribed Keflex (Cephalexin) for the "infected area." (ECF No. 42, Pl.'s Opp'n at 46 ¶ 89.)  However, Plaintiff's interpretation is contradicted by the evidence he cites.

[13] Plaintiff attempts to dispute this fact by adding additional information that was noted on Cherekoff's progress note. However, Plaintiff cannot dispute this fact as stated by adding additional facts which do not change the substance of the statement of fact as stated.   To the extent such additional information is relevant and material, it will be addressed, if appropriate, in the analysis portion of this order.

[14] As with Statement No. 79, Plaintiff attempts to dispute this fact by adding additional information that was set forth on the findings of the radiology report, dated April 26, 2011.

was 7 to 8 out of 10 despite talking in complete sentences and not having evidence of pain when aggressed."

77.     Dr. Williams further observed that Plaintiff "does not have any evidence of discomfort. On direct examination whenever he is asked to perform certain tasks he notes pain and overacts to stimuli" and that "pain improved with wearing his New Balance shoes with inserts."[15]

78.     Nowhere in his report did Dr. Williams note or list Plaintiff's injury or pain as 100% percent.[16]

79.     On June 1, 2011, as a result of Dr. Williams' assessment, NP Chenerkoff continued Plaintiff on Tylenol 3 and recommended for physical therapy for his left foot and right shoulder.

80.     On June 17, 2011, Plaintiff was examined by Dr. Noman for his complaint "I still got pain I can't sleep at night" and for shoulder pain.

81.     On November 18, 2011, Plaintiff submitted a new Health Care Services Request form stating "I have been to see a off site pain doctor and he and CMO Wang prescribed me 1-2 T-3 3 times a day not to exceed 5 per day my prescription got messed up last time the doctor wrote it and it runs out on 11-20-11[.]  Please correct and refill it."

82.     On November 21, 2011, Dr. Clark prescribed Tylenol 650 mg for 90 days.[17]

83.     On December 6, 2011, Plaintiff saw a yard doctor. Dr. Nareddy, who examined his foot and responded to his complaints of chronic foot pain.

---

[15] Plaintiff attempts to dispute this fact by citing to the same report referenced by Defendants but fails to explain why and how this statement is disputed.  Accordingly, this fact is undisputed.  See Local Rule 260(b) (in opposing a statement of undisputed fact the party must provide "a citation to the particular portion of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.")

[16] Plaintiff attempts to dispute this fact by citing the report by Dr. Williams and stating "list as chronic in nature." (ECF No. 42, Pl.'s Opp'n at 49 ¶ 107.)  However, Plaintiff's reference does not place this statement of fact in dispute and although Plaintiff does not provide a point page reference, on page 3 of Dr. Williams' report it states that Plaintiff "is currently in a chronic stage regarding his right shoulder and left foot pain.  His postoperative period has ended and no longer had indication for high levels of opioid medications." (Clark Decl. Ex. A at 54.)

[17] Plaintiff disputes this fact by stating on November 21, 2011, Dr. Clark took Plaintiff's opioid pain medication "once again w/out a taper in violation of Ex A pg 72-73." (ECF No. 42, Pl.'s Opp'n at 50 ¶ 113.)  However, the fact that Dr. Clark may have also taken away certain medications does not dispute the fact that he prescribed Tylenol 650mg on this day.  In addition, Plaintiff's may not dispute this fact by arguing the legal conclusion that he violated the pain management guidelines.

84.     Dr. Nareddy continued his Tylenol 3 and started him on Trileptal for neuropathic pain, and indicated they "would recheck him in 45 days for further evaluation and maybe in the future we will also refer to the pain committee again."[18]

85.     On January 25, 2012, Plaintiff was referred to a behavioral therapist, Dr. Ruff, PhD., for his complaints of chronic pain in his shoulder and foot.

86.      Dr. Ruff, PhD's notes from the mental health examination did not address any causation for his alleged pain, nor did it identify his pain as permanent.

87.     There is no evidence that a Dr. Deuntinger, a psychologist, examined Plaintiff and concluded that Plaintiff needed permanent pain management care and medication because of negligent post-injury care.[19]

88.     On or about January 26, 2012, the pain management committee, of which Dr. Clark was a participant, increased Plaintiff's Tylenol-3 dosage and placed him on chronic pain management therapy not just because of his complaints of foot pain but because of his claimed shoulder pain from an old gunshot wound.

89.     Plaintiff is not a medical expert and has no medical training to determine causation of his foot deformities or foot pain.

90.     Other than in 20-06, Plaintiff was never personally seen or treated by Dr. Clark, and was never directly seen or treated for his toe injury by Dr. Clark.

91.     William W. Brien, M.D., is qualified to render an opinion as to causation and standard of care issues concerning orthopedic matters.

**C.     Evidentiary Objections**

Defendants raise objections to several paragraphs of Plaintiff's declaration and certain documentary evidence submitted in support of his opposition to Defendants' motion.

///

---

[18] Plaintiff disputes this fact by stating "deny was already pain management from right shoulder G.S.W."  (ECF No. 42, Pl.'s Opp'n at 50 ¶ 115.)  The fact that Plaintiff was already in pain management for his right shoulder is not relevant and does not dispute the evaluation and findings by Dr. Nareddy on December 6, 2011.

[19] Plaintiff attempts to dispute this fact by stating "proof at trial."  Plaintiff cannot attempt to dispute a fact by claiming he will produce evidence at the time of trial because he must do so in opposing a motion for summary judgment.

It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted; and therefore, the Court declines to address each objection many of which are not evidentiary objections but arguments regarding interpretation of the evidence.  See Capital Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010).  With respect to objections in general, the Court notes that "[a]t summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial."  Nevada Dep't of Corr. v. Greene, 648 F.3d 1014, 1019 (9th Cir. 2011) (citing Block v. City of Los Angeles, 253 F.3d 410, 418-419 (9th Cir. 2001) (internal quotations omitted).  The focus is on the admissibility of the evidence's contents, not its form.  Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2001); Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Cheeks v. General Dynamics, 22 F.Supp.3d 1015, 1027 (D. Ariz. 2014).  The Court also notes that "the requirement of personal knowledge imposes only a minimal burden on a witness; if reasonable persons could differ as to whether the witness had an adequate opportunity to observe, the witness's testimony is admissible." Strong v. Valdez Fine Foods, 724 F.3d 1042, 1045 (9th Cir. 2013) (internal quotations and citation omitted).  Although allegations based purely on belief do not suffice, the personal knowledge threshold is particularly low at summary judgment because all justifiable inferences must be drawn in favor of the nonmoving party.  Id. Thus, "[u]nfounded speculation as to an affiant's alleged lack of personal knowledge of the events in his affidavit does not render it inadmissible."  Greene, 648 F.3d at 1019.

In addition, to the extent statements are offered by Plaintiff or other inmate witnesses that are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis.  See Burch v. Regents of University of California, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment.  Objections on any of these grounds are simply superfluous in this context.") (citation omitted.)

///

///

16

The Court declines to rule on each and every evidentiary objection set forth by Defendants; rather the Court will address the evidentiary objections as relevant to the determination of the instant motion in the analysis section of this order.

### D.     Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact

precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).  The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In arriving at the Findings and Recommendations, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection.  This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### E.   Deliberate Indifference to Serious Medical Need

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  <u>Snow v. McDaniel</u>, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, <u>Peralta v. Dillard</u>, 744 F.3d 1076, 1082-83 (9th Cir. 2014); <u>Wilhelm v. Rotman</u>, 680 F.3d 1113, 1122 (9th Cir. 2012); <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  <u>Wilhelm</u>, 680 F.3d at 1122 (citing <u>Jett</u>, 439 F.3d at 1096).  Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  <u>Wilhelm</u>, 680 F.3d at 1122 (citing <u>Jett</u>, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  <u>Snow</u>, 681 F.3d at 985 (citation and quotation marks omitted); <u>Wilhelm</u>, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner - or between medical professionals - concerning what medical care is appropriate does not amount to deliberate indifference."  <u>Snow v. McDaniel</u>, 681 F.3d 978, 987 (9th Cir. 2012) (citing <u>Sanchez v. Vild</u>, 891 F.2d

240, 242 (9th Cir. 1989)), overruled in part on other grounds, <u>Peralta v. Dillard</u>, 744 F.3d 1076, 1082-83 (9th Cir. 2014); <u>Wilhelm v. Rotman</u>, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (citing <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1986)).  Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health."  <u>Snow</u>, 681 F.3d at 988 (citing <u>Jackson</u>, 90 F.3d at 332) (internal quotation marks omitted).

Delays in providing medical care may manifest deliberate indifference.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-105 (1976).  To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful.  <u>See</u> <u>Hallett v. Morgan</u>, 296 F.3d 732, 745-746 (9th Cir. 2002); <u>Berry v. Bunnell</u>, 39 F.3d 1056, 1057 (9th Cir. 1994).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."  <u>Jett v. Penner</u>, 439 F.3d at 1096.

### F.    Motion for Summary Judgment by Defendants Clark and Gray

As previously stated, Plaintiff alleges that Dr. Clark delayed approving crutches after he injured his toe; refused and delayed transporting him to an emergency facility after he fell and re-injured himself; instructed LVN Gray to deny him a dose of morphine; delayed approving a follow up appointment to an outside specialist for a cast removal; and discontinued "any and all further treatment" for his toe, including treating the infection that allegedly resulted from the cast being left on his foot too long.

With regard to LVN Gray, Plaintiff contends that she violated the Eighth Amendment by carrying out Dr. Clark's order to deny him the one dose of morphine, and that she also refused to call "man down" when he requested it.

The Court will address each of Plaintiff's sub-claims, separately, in the following sections.

1.    <u>Delay by Defendant Dr. Clark in Issuance of Crutches</u>

Plaintiff contends that NP M. Dhah requested crutches for him on September 30, 2010, but that Dr. Clark "refused to authorize the order until 10-13-2010," which forced Plaintiff to walk on his

broken foot, "resulting in further injury, which adversely affected the healing process, and caused deformity in Plaintiff's foot." (ECF No. 1, Compl. ¶¶ 36-39.)

Defendant Dr. Clark submits he does not recall being made aware of NP Dhah's request for crutches, and during the period of September 30th and October 13th, 2010, as acting CMO, he did not personally treat patients. (ECF No. 35-3, Clark Decl. ¶ 6.)

There is no evidence to support Plaintiff's claim that Dr. Clark was even made aware of the need for crutches during September 30th and October 13th, 2010. First, Plaintiff admitted at his deposition that he had no idea if or when Dr. Clark would have received NP Dhah's request for crutches. (ECF No. 35-3, Clark Decl. Ex. B, Transcript of Excerpts of Pl.'s Dep. at pp. 13-14 (113:11-114:2).) In order to be liable for medical deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, 511 U.S. at 837. Dr. Clark cannot be held liable if he did not know of Plaintiff's request or need for crutches during the period alleged in the complaint, and Plaintiff's speculation that Dr. Clark must have known about the injury is insufficient to defeat summary judgment. Plaintiff's claim that Dr. Clark did not approve the crutches until October 13, 2010, does not create a dispute of material fact that he was aware of such need prior to such date.

Further, the evidence demonstrates that Plaintiff was offered crutches soon after he requested them on September 29th, but Plaintiff refused not because they were defective but because he wanted a wheelchair instead and then later stated "I'm not going to pay for a medical device that is a requirement." (Clark Decl., Ex A at pp, 7, 9.)

Moreover, contrary to Plaintiff's claim, Dr. Stewart at the San Joaquin Community Hospital did not prescribe crutches or any other mobility aids when Plaintiff was discharged and no such order was located by the prison nurse. (Clark Decl., Ex. A at pp. 5-6.) Plaintiff's claim that correctional officer Hamilton's declaration supports him claim for the need of crutches or a wheelchair, is not supported by a review of Hamilton's declaration. (ECF No. 35-12.) Rather, Hamilton merely explains the offer of crutches and use of a wheelchair in transporting back from the emergency room in September 2010 via use of a wheelchair. (ECF No. 35-12, Hamilton Decl. ¶¶ 3-4.) In addition, when Plaintiff was sent to the prison ER for a cast, the medical staff noted he could walk or

"ambulate" to the prison without a wheelchair or crutches.  (Clark Decl. ¶ 6 & Ex. A at p. 11.)

Furthermore, the yard doctor, Dr. Liberstein who examined Plaintiff on October 13, 2010, ordered

solid non-flexible sole shoes, which are not prescribed for someone who needs crutches to walk.

(Clark Decl. ¶ 6.)

As there is no dispute of material fact that Dr. Clark was aware of any need for crutches prior

to his approval on October 13, 2010, Defendant Dr. Clark could not have acted with "deliberate

indifference" toward any serious medical need and he is entitled to summary judgment on this claim.

The undisputed facts do not support the conclusion that Defendant Dr. Clark acted or failed to act with

the mental state necessary to establish an Eighth Amendment violation, and Dr. Clark is entitled to

summary judgment on this claim.

2.  <u>Delay of Treatment or Emergency Transport for Fall and Re-Injury by Defendant</u>
<u>Clark</u>

Plaintiff contends that Dr. Clark was deliberately indifferent by refusing to personally examine

him or to order treatment or transport to the emergency room when Plaintiff allegedly re-injured his

toe after a fall inside his cell on January 20, 2011.[20]  (ECF No. 1, Compl. ¶¶ 46-48.)

It is undisputed that Dr. Clark, as the acting CMO did not personally treat Plaintiff, and

therefore had no knowledge of any re-injury to Plaintiff's foot on or about January 20th.  (Clark Dec.

Ex. B at p. 7, Pl.'s Depo. at 65:13-23.)  Contrary to Plaintiff's claim, LVN Osunde declares that she

did not notify Dr. Clark of Plaintiff's alleged fall and re-injury that day, and they both have denied

under oath having such discussion.  (Clark Decl. ¶ 7; Osunde Decl. ¶ 4.)  In response, Plaintiff cites to

the CDCR 7362 Health Care Services Request Form dated January 20, 2011, and indicates that LVN

Osunde specifically referenced that she called Dr. Clark for referral the following morning.  However,

contrary to Plaintiff's claim, the cited evidence does not support his interpretation.  Dr. Clark is

nowhere referenced on the CDCR 7362 Health Care Services Request Form dated January 20, 2011,

by LVN Osunde.  (ECF No. 42, Pl.'s Opp'n Ex. A at 24.)  Rather, the CDCR 7362 Form indicates that

---

[20] Plaintiff also asserts that he fell in his cell because he was not given any mobility devise to assist him in his daily movements.  (ECF No. 1, Compl. ¶ 46.)  However, it is undisputed that in the weeks prior to this alleged fall, Dr. Clark approved Dr. Ulit's request for crutches and Plaintiff refused crutches on January 10, 2011.  (Clark. Decl.¶ 7 & Ex. A at pp. 23, 26.)  Plaintiff refused the crutches stating "I already have a wheelchair."  (Clark Decl. Ex A. at p. 36.)

Plaintiff was referred (as was proper protocol) to a registered nurse.  Indeed, LVN Osunde declares "[t]here was no need for me to notify Dr. Clark and it is not within my practice to go directly to the CMO with medical complaints such as the one [Plaintiff] presented, nor is he the next person on my chain of command.  Instead, I am to refer him to a registered nurse, which, as indicated in my examination notes, was what I did that day.  In addition, I deny that Dr. Clark informed me he would deny transportation for [Plaintiff] or refuse to provide him with any medical care."  (ECF No. 35-10, Decl. of Osunde ¶ 5.)  Plaintiff's citation to LVN Osunde's notes does not support his argument that Dr. Clark was telephoned on January 20, 2011, and his speculation to the contrary is insufficient to create a material issue of disputed fact on this claim.

Furthermore, there is no evidence to show that Plaintiff required emergency medical attention on January 20, 2011.  Plaintiff's claim that LVN Osunde noted "redness" in his foot and tried to have him admitted to the prison ER (the Acute Care Hospital or "ACH") but her request was denied by Dr. Clark is not supported by the evidence.  Plaintiff's citation to LVN Osunde's notes reveals Plaintiff's misreading of her notes.  LVN Osunde wrote "0 redness noted," which reveals she did not see any redness.  (ECF No. 42 at p. 78.)  Thus, absent a need for ER placement, not noted in LVN Osunde's report, there was no need to contact the CMO in order to have Plaintiff admitted to the ACH for an emergency.  (ECF No. 35-2, Clark Decl. at 2:9-14.)

The undisputed facts do not support the conclusion that Defendant Dr. Clark acted or failed to act with the mental state necessary to establish an Eighth Amendment violation.  Accordingly, Defendant Dr. Clark is entitled to summary judgment on this claim.

3.   <u>Lack of Receipt of One Dose of Morphine by Defendant LVN Gray as Ordered by Defendant Dr. Clark</u>

Plaintiff contends that on January 26, 2011, LVN Gray "on the order of (CMO) E. Clark, refused to provide pain medication that were prescribed on January 24, 2011, and also refused to act on Plaintiff's call of 'man down.'"  (ECF No. 1, Compl. at ¶ 54.)

Defendants argue that Plaintiff's allegations are not supported by any admissible evidence and cannot create a claim against Dr. Clark for medical deliberate indifference.  Defendants submit that Plaintiff missed one dose of morphine the afternoon of January 26th because LVN Gray could not find

a prescription for it and therefore was not permitted to dispense it, not because of any order or instruction from Dr. Clark.

It is undisputed that Plaintiff was to receive his first dose of Morphine on the afternoon of January 24th, two additional doses for January 25th, two additional doses on January 26th, and one final dose on the morning of January 27th.  (Clark Decl. ¶ 8.)  It is also undisputed that LVN Gray worked in the housing unit where Plaintiff was housed in the afternoon of January 26, 2011, so she would have been responsible for dispensing the 5th dose (afternoon of January 26th).  (LVN M. Gray Decl. ¶ 5.)  It is further undisputed that LVN Gray did not provide Plaintiff with a dose of Morphine (as was under prescription) on January 26, 2011.

Defendant LVN Gray declares that on the afternoon of January 26, 2011, she could not find a prescription for Morphine and therefore was not permitted to dispense it.  (Gray Decl. ¶ 5.)  Gray denies that the dosage was not issued because of any order or instruction from Dr. Clark.  (Id. ¶ 4.)  Gray further declares that it would have been a breach of protocol for her to discuss Plaintiff's medical care with the acting CMO instead of with her direct supervisor.  (Id. ¶ 4.)  Both Dr. Clark and LVN Gray deny ever discussing Plaintiff's medical issues with one another.  (Clark. Decl. ¶ 8; Gray Decl. ¶ 4.)  LVN Gray declares that she was not disciplined or reprimanded for her actions on January 26, 2011, but she was issued a letter of counsel which is a reminder of the proper procedure for verifying medication and prescriptions.  (Gray Decl. ¶ 6.)

Defendants further argue that any harm in missing a single dose of Morphine does not arise to a constitutional harm, particularly given that Plaintiff was already taking Tylenol 3 with codeine at the same time for his pain (which itself is an opiate and stronger than over the counter pain medication).

Plaintiff alleges and declares under penalty of perjury that on January 26, 2011, LVN Gray on Dr. Clark's order refused to provide Plaintiff his prescribed medication as approved by CMO Dr. McCabe on January 24, 2011.  LVN Gray informed Plaintiff that Dr. Clark had cancelled "all" of his pain medication due to a 602 inmate appeal and a staff complaint Plaintiff had filed against Clark.  (ECF No. 42, Pl.'s Opp'n at 12-13.)   Defendants' objection to Plaintiff's statements by LVN Gray as inadmissible hearsay is overruled.  A statement by a party opponent does not fall within the hearsay rule.  Fed. R. Evid. 801(d).

Plaintiff's deposition testimony regarding the denial of the dosage of Morphine on January 26, 2011, is consistent with such claim.  At his deposition, Plaintiff testified that on January 26, 2011, while Plaintiff was in pain from him metal pin in his foot, LVN stated, "I'm not coming between you and Dr. Clark.  Whatever you have going on, he has taken your medication as a direct result of the two staff complaints he filed against you."  (Pl.'s Depo. at 50:4-7.)    And she told Plaintiff he could "F'ing 602 it if you don't like it, I don't care.  And she walked off, broker her security escort and walked off."  (Pl.'s Depo. at 50:7-10.)

In support of his claim, Plaintiff submits the declarations of inmate witnesses, Andrew Berry,[21] Carlos L. Contreras, Stanley Williams, and Michael Thomas.  (ECF No. 42-1, Pl's Opp'n Ex. B 1-4.)  Defendants object to the consideration of the declarations of fellow witnesses relating to the incident on January 26, 2011, between LVN Gray and Plaintiff as inadmissible hearsay and for lack of foundation.[22]   While these inmates may not render any medical opinion, absent such proper qualifications-not present in their declarations, these inmates can testify as to what they observed and heard on January 26, 2011.  A statement made by the opposing party or by the party's agent or employee on a matter within the scope of the relationship is not hearsay when offered into evidence against the opposing party.  Fed. R. Evid. 801(d)(2)(D).  Whether these inmates were logistically within the physical vicinity to observe and hear the incident on January 26, 2011, is a consideration for the trier of fact and cannot be determined and resolved at the summary judgment stage.[23]  Further,

---

[21] Defendants objection to Mr. Berry's declaration as vague and for failure to establish he was actually in the cell next to Plaintiff's at the time of encounter with LVN Gray and officer Medina, is overruled.  Mr. Berry clearly states "at all times relevant herein I was housed in 4B-4L #11 directly next door to inmate Vella at CSP-Corcoran SHU in Corcoran California."  Further, he states "On January 26, 2011, at the first of 2 pill passes LVN Gray approached Mr. Vella's cell and told him that his medication had been cancelled and she had made several calls and Dr. Clark had cancelled them.  Mr. Vella went on to tell her he was in severe pain and had been for most of the day and at this time he was "man down." (ECF No. 42-1 at p. 29; Andrew Berry Decl. ¶¶ 1, 4.)

[22] Pursuant to Rule 56(c)(4) of the Federal Rules of Civil Procedure, an affidavit submitted in opposition to a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  At the summary judgment stage, the court focuses not on the admissibility of the evidence's form but on the admissibility of its contents.  Block v. City of Los Angeles, 253 F.3d 410, 418-419 (9th Cir. 2001).

[23] Defendants submit the declaration of litigation coordinator, M. Kimbrell, who provides each of the inmate witnesses locations on January 26, 2011.  Each of the four inmate witnesses, along with Plaintiff, were housed in COR's security

Defendants claim as to the questionable credibility of such declarations is not a basis to exclude consideration of such declarations.  Any credibility determination of any inmate declaration is an issue for the trier of fact.  They can testify as to their perception of the situation.

The fact that Plaintiff's grievance, Log No. 09-10-15223 (dated October 12, 2010), was partially granted at the second level of review by Defendant Dr. Clark (on January 26, 2011)  does not overcome the fact that Plaintiff had previously filed a complaint specifically claiming he was suffering in pain from his broken toe at the hands of CMO E. Clark.[24]  Indeed, Plaintiff was dissatisfied with the second level response review and sought review at the third level.  (ECF No. 42-1, Pl.'s Opp'n Ex D-1.)  Dr. Clark was indisputably aware of the grievance as he initially reviewed and signed the grievance on December 29, 2010.  (Id.)

In addition, the fact that Plaintiff's grievance, Log No. COR-09-10-15251) was decided and signed by another doctor, Dr. McCabe on January 26, 2011, and granted not denied, likewise does not overcome his claim for deliberate indifference.  This grievance which was submitted by Plaintiff on October 24, 2010, specifically alleged "[t]his appeal is being filed as a staff complaint against CSP Corcoran Chief Medical Officer (CMO) E. Clark.  E. Clark or the medical staff below the CMO are displaying deliberate indifference to my severe medical needs . . .  And bypass this appeal to the highest level so petitioner can exhaust admin remedies so a civil action can be filed against E. Clark."  (ECF No. 42-1, Pl.'s Opp'n Ex. D-2.)  Defendant Dr. Clark was clearly aware of this grievance as he reviewed and signed the grievance on December 14, 2010.  (Id.)  Even if Dr. Clark did not deny any appeal, there is no dispute he was aware of Plaintiff's grievances prior to the incident on January 26,

---

housing unit (commonly referred to as the "SHU"), 4B-4L.  However, each of them were housed in different cell numbers. Kimbrell declares that the SHU is divided into three sections-A, B, and C, with Section A containing cell numbers 1 through 20, Section B containing cell numbers 21 through 40, and Section C containing cell numbers 41 through 64.  Each section is divided by a solid concrete wall.  On January 26, 2011, only inmate Andrew Berry (K51099) was housed in Section B with Plaintiff. (J22392).  (ECF No. 45-1, M. Kimbrell Decl. ¶¶ 3-4.)  Defendants' objection is overruled, as it clear from a review of the declarations by inmates Contreras, Williams, Thomas were able to overhear the conversation between Plaintiff and LVN Gray based on the opening of the door between Sections A and B of the SHU.  (ECF No. 42-1 at pp.30-32.)

[24]  The second level review stated Plaintiff's appeal was partially granted and indicated that surgery was provided on January 24, 2011; Plaintiff's foot was in a cast; Plaintiff was given crutches, and Morphine was provided for pain management.  (ECF No. 42-1, Pl.'s Opp'n Ex. D-1.)

2011, and if Plaintiff's version of the facts are believed to be true, he may have acted with deliberate indifference to a serious medical need to retaliate for filing grievances.

Further, the fact that Plaintiff missed a single dose of Morphine, and was potentially taking Tylenol 3 with codeine, does not overcome his claim against LVN Gray and Dr. Clark for deliberate indifference to his serious medical need.  The cases cited by Defendants are inapposite.  Plaintiff's claim does not involve whether the tapering of his pain medication to a lesser strength was medically acceptable (see ECF No. 35-1 at p. 17, citations therein), but rather intentional deliberate action on the part of Defendants Dr. Clark and LVN Gray by denying a dose of Morphine that Plaintiff was indisputably entitled to receive regardless of a lesser strength medication he may have been receiving at such time.

For the same reasons set forth above, there is disputed issues of material fact as to Plaintiff's deliberate indifference based on the fact that LVN Gray intentionally  refused to call a "man down" based on orders by Dr. Clark despite Plaintiff's symptoms of pain, and Defendants are not entitled to summary judgment on this claim either.  Accordingly, based on the dispute of material facts as to the reason (honest mistake versus deliberate action) for the denial of Plaintiff's 5th dose of morphine on January 26, 2011 and failure to call "man down" and summon any medical assistance, Defendant Clark and Gray's motion for summary judgment must be denied.

4.      Delay by Defendant Dr. Clark in Follow-Up Appointment with Dr. Paik

Plaintiff contends that Dr. Clark delayed the follow up appointment to see Orthopedic Surgeon, Dr. Paik for 44 days, to remove his foot cast.  Plaintiff alleges that Dr. Noman submitted an "urgent" cast removal order, and contacted Dr. Clark and another CMO, Dr. McCabe, but the request "went unadhered to."  (ECF No. 1, Compl. ¶ 56.)  Plaintiff also contends that FNP Kaur and FNP Dhah submitted urgent requests as well.  (Id. ¶¶ 57-58.)

///

///

///

///

///

26

It is undisputed that there was a 42 day delay from the date Dr. Paik directed Plaintiff to return for removal of his cast (January 31, 2011-one week following the January 24, 2011, evaluation by Dr. Paik) to the actual date that the cast was removed March 14, 2011.[25]

Defendant Dr. Clark argues there is no evidence to show that he "acted with the intent to interfere with Plaintiff's medical care" by obstructing or delaying the follow up appointment with Dr. Paik.  Dr. Clark declares that as the acting CMO, he had no control over how an appointment with an outside medical provider is scheduled, nor does he have the responsibility to know whether each patient inmate is due for a follow up visit until a treating physician tells him.  (Clark Decl. ¶¶ 10, 12.)  Dr. Clark submits that he relied upon and approved Dr. Noman's assessment Plaintiff needed to see Dr. Paik for a follow up on an "urgent" but not an "immediate" basis.  (Clark Decl. ¶ 11, Ex. A at p. 36.)   Dr. Clark argues the fact the appointment was not eventually made for another month or so by Dr. Paik's office and the Utilization Management office is something outside of Dr. Clark's control and cannot be a basis to subject him to liability for deliberate indifference.  (ECF No. 35-1, Motion at pp. 18-19.)

Plaintiff argues and submits evidence that Dr. Noman put in an "urgent" request for removal of Plaintiff's case and noted that he spoke directly to Dr. Clark on February 2, 2011.  (ECF No. 42, Pl.'s Opp'n ¶ 17, Ex. A at pp. 40-42.)  Dr. Clark declares that Dr. Noman's request was made on an "urgent" basis, which meant that he wanted the appointment to be scheduled "within 14 days" not "immediately."  (Clark Decl. ¶ 11.)  In contrast, Plaintiff submits a blank CDC 7362, Health Care Services Request Form in which it refers to an appointment scheduled as "urgent" to be "within 24 hours" and a "routine" appointment is to be scheduled "within 14 calendar days."  (ECF No. 42, Pl.'s Opp'n Ex. A at 43.)  It is undisputed that Dr. Clark was aware of the need for referral to Dr. Paik for removal of Plaintiff's foot cast on two separate occasions, and Plaintiff was not transferred in response to Dr. Clark's requests for transfer within 24 hours.

///

---

[25] This calculation is different from the time frame referenced by Defendants of "44" days and the time frame referenced by Plaintiff as "48" days.  However, irrespective of the actual number of days, i.e. 42, 44, or 48, the analysis herein remains the same.

On February 16, 2011, FNP Kaur put in another "urgent" request for services to remove the cast to no avail.  (ECF No. 42, Pl.'s Opp'n Ex. A at 44.)  The CMO was called again and it was noted he would call to schedule an outside appointment.  (Id.)

Despite Dr. Clark's notice of the failure to remove Plaintiff's cast on two separate occasions, spanning over a month in time, Dr. Clark did not check on the status of the referral or take any other action to ensure that Plaintiff's medical needs were adequately meet.  It is undisputed the removal of the cast was deemed "urgent" and there is a dispute as to the effect of the scheduling of the appointment as "urgent."  Dr. Clark declares that he does not know why Plaintiff was not brought to see Dr. Paik soon after the approval on February 2, 2011 and again on March 8, 2011.  (Clark Decl. ¶ 13.)  Although Dr. Clark submits that it is the utilization management (who report to the Director of Nursing and are not under the supervision of the CMO) that schedule outside appointments, in this instance, Plaintiff had an outside appointment issued by Dr. Paik to return within one week from January 24, 2011, which was inexplicitly not honored.  Without further information or explanation as to why Plaintiff was not transported to Dr. Paik's office for removal of the cast within the scheduled time period, there is a material issue of fact as to whether Dr. Clark's failure to ensure the administration of the prescribed removal of Plaintiff's cast was deliberate indifference to a serious medical need.  Indeed, the fact that the February 16, 2011, progress notes by FNP Kaur indicate that the CMO (at that time Dr. McCabe) would call to schedule the outside appointment supports an inference that the CMO has some control over scheduling the appointment in this instance.

As to Defendant's claim that Plaintiff did not suffer further injury from such delay, it is undisputed that Plaintiff complained on several occasions that he was in pain due to the failure to remove the foot cast, and the needless suffering of pain may be sufficient to demonstrate further harm. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  Viewing the facts in the light most favorable to Plaintiff, the Court concludes that a triable issue of fact remains whether the 42 day delay in removal of Plaintiff's case constituted deliberate indifference by Dr. Clark.  See Wilhelm v. Rotman, 680 F.3d 1113, 1123 (9th Cir. 2012) (doctor's awareness of need for treatment followed by his unnecessary delay in implementing the prescribed treatment sufficient to plead deliberate indifference).

///

1          5.      Failure by Defendant Dr. Clark to Treat Plaintiff's Foot Infection

2          Plaintiff alleges that the failure to timely remove his cast caused his foot to emanate a "horrible

3   and putred (sic) smell" and led to infections, which, as a further result of Dr. Clark's failure to

4   properly treat the infection, caused "rotting of the flesh" and "permanent damage and severe pain in

5   his foot."  Plaintiff further alleges that Dr. Clark (among others) "delayed and/or withheld antibiotics

6   for the infection," and Dr. Clark "canceled any and all further treatment for Plaintiff's injuries and

7   medical needs" despite Plaintiff's "deep lesions," as noted on September 19, 2011 by the physical

8   therapist.

9          Dr. Clark argues that Plaintiff's complaint is contradictory, by alleging on the one hand that

10  Dr. Clark cancelled "any and all further treatment for Plaintiff's injuries and medical needs," but on

11  the other hand also alleges that Plaintiff continued to receive pain management care from various pain

12  management specialists, and Dr. Clark subsequently placed him on long term pain management

13  therapy in January 26, 2012.

14         In addition, Defendant argues that Plaintiff was adequately treated for his foot infection, and

15  there is no evidence that he was even aware of the foot infections and need for further treatment.  In

16  any event, Defendant argues that Plaintiff suffered no harm due to the denial of "any and all" medical

17  treatment for his toe injury.

18         Dr. Clark approved Tylenol 650 mg to address Plaintiff's complaint of pain on November 21,

19  2011, and that prescription was increased to Tylenol 3 by another yard doctor, Dr. Nareddy, on

20  December 6, 2011.  (Clark Decl. Ex A at pp. 59-60.)  In late January 2012, Plaintiff was referred to

21  and consulted with a mental health and behavioral therapist, Dr. Ruff, Ph.D., a physical therapist, and

22  was placed on a long term pain management therapy by Dr. Clark and the pain committee.  (Clark

23  Decl. Ex A at pp. 61-62, 65-66.)  Plaintiff continued to receive physical therapy for his foot pain after

24  September 15, 2011.

25         It is undisputed that Plaintiff continued to receive medical care for his injury and pain during

26  the time following the removal of his cast.  (See, e.g., ECF No. 42, Pl.'s Opp'n at pp. 15:3-10;[26] 17:1-3

27

28  _____
    [26] These page numbers reference the pagination identified by Plaintiff at the bottom of each page.

[Plaintiff was prescribed Tylenol 3 for pain and Keflext for abrasions on March 21, 2011 and May 2, 2011]; 15:12-15 [Dr. Clark approved physical therapy for Plaintiff]; 16:22-28 [Dr. Beregovskaya prescribed antibiotics and ordered an X-ray to rule out osteomyelitis]; 17:17-21 [on May 31, 2011, Plaintiff was referred to and evaluated by a pain specialist, Dr. Williams].)  Even after September 19, 2011, Plaintiff admits he was continued to receive medical care for his pain and foot infections.  (See, e.g., ECF No. 42 at p. 19:2-28 [demonstrating that Plaintiff was seen by yard doctors, a behavioral therapist, psychologist, and referred for pain management from December 6, 2011, to January 26, 2012].)

In opposition, Plaintiff attaches a letter from the Prison Law Officer, dated April 26, 2011, which states in relevant part:

We spoke with Dr. Clark about your concern (regarding medical treatment) at a telephone conference on 4/21/2011.

> Dr. Clark said that you have not been evaluated for your pain.  However, he said you last saw your primary care provider (PCP) on 3/29/2011, who noted that your foot had some swelling, your wounds were healed, and there was no drainage, and ordered a follow-up appointment in 60 days.  He said you were evaluated by physical therapy on 4/11 where it was noted you have tenderness at your joints, decreased strength, flexibility, and range of motion, mild swelling, and hammertoe.  He said you are receiving physical therapy twice a week for three weeks.  He said you are currently on 600mg ibuprofen three times a day.
>
> Dr. Clark also said you had an orthopedics consultation on 3/14/2011.  He said you received exercises and stretches for your foot, and that regular shoes and walking are appropriate for your condition. . . .

(ECF No. 42-1, Pl.'s Opp'n Ex. A at 68.)

This letter is consistent with the medical records submitted in support of Defendants' motion for summary judgment, and there is no dispute of material fact that Plaintiff received medical care well after his cast was removed.  Further, there is no admissible evidence that Dr. Clark was aware of Plaintiff's lesions or infections but failed to treat them and thereafter canceled "any and all" further treatment for his toe injury.  Plaintiff's mere submission of several medical evaluations and reports indicating that he developed lesions in the weeks/month following removal of his cast, and lay opinion that he did not receive proper treatment at the hands of Dr. Clark does not support a claim for

deliberate indifference against Dr. Clark.  See Hutchison v. United States, 838 F.2d 390, 392 (9th Cir.

1988) (appropriate standard of care for medical treatment can only be established by expert testimony;

inmate plaintiff's allegations supported only by lay opinions failed to present a triable issue of fact.)

Accordingly, Dr. Clark is entitled to summary judgment on this claim.

> 6.    Qualified Immunity for LVN Gray

Defendant Gray argues that she is entitled to qualified immunity even if it were true that she

denied Plaintiff Morphine or refused to summon medical on Dr. Clark's orders.  LVN Gray reasons

that she is required to carry out a physician's orders without alteration, since she lacks medical

training to diagnose or prescribe treatment.  (Gray Decl. ¶ 3.)  Defendant Gray submits that at the time

of the incident, there was no law or legal authority supporting a finding of deliberate indifference for

an LVN who complies with a CMO's instructions.

Government officials performing discretionary functions generally are shielded from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982).  In determining whether a governmental officer is immune from suit based on the

doctrine of qualified immunity, that court must answer two questions.  The first is, taken in the light

most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

violated a constitutional right?  Saucier v. Katz, 533 U.S. 194, 201 (2001).  A negative answer ends

the analysis, with qualified immunity protecting defendant from liability.  Id.  If a constitutional

violation occurred, a court must further inquire "whether the right was clearly established."  Id.  "If the

law did not put the [defendant] on notice that [his or her] conduct would be clearly unlawful, summary

judgment based on qualified immunity is appropriate.  Id. at 202.

In this instance, as stated above, there is a disputed issue of material fact as to whether

Defendant LVN Gray acted with deliberate indifference in failing to provide Plaintiff with his 5th

dosage of Morphine and failure to call "man down" on January 26, 2011.  Turning to the second prong

of the qualified immunity determination, the undersigned finds that a reasonable Licensed Vocational

Nurse would have known that intentionally failing to provide Plaintiff with a dosage of Morphine (that

was properly prescribed) for his foot pain and failure to call "man down" and provide any medical

assistance on January 26, 2011, even based on order by the CMO would violate Plaintiff's Eighth

Amendment right to adequate medical care.  See, e.g., Holloway v. Delaware Cnty. Sheriff, 700 F.3d

1063, 1075 (7th Cir. 2012) ("Nurses may generally defer to instructions given by physicians, but that

deference may not be blind or unthinking, particularly if it is apparent that the physician's order will

likely harm the patient.")

### G.    Motion for Summary Judgment by Defendant Doctor Paik

Plaintiff alleges that Dr. Paik acted with deliberate indifference to his serious medical needs by

the care and treatment Dr. Paik rendered to Plaintiff following his January 5, 2011, surgery at Mercy

Hospital.

Defendant Dr. Paik moves for summary judgment on the ground that there is no triable issue of

material fact that at all times he met the applicable standard of care, and in the alternative, there is no

causal link between any action or inaction by Dr. Paik and Plaintiff's claimed injuries and damages.

### 1.    Deliberate Indifference by Dr. Paik

It is undisputed that Dr. Paik first saw Plaintiff on October 22, 2010, by way of telemedicine

for an evaluation regarding Plaintiff's left foot.  Dr. Paik noted that Plaintiff's x-ray showed a

dislocated of the metatarsophalangeal ("MP") joint of the fifth left toe, but also that Plaintiff had

multiple claw toe deformities and other toes, not just the fifth left toe.  Such deformities were of

unknown causes ("unknown etiology"), unrelated to any recent acute traumatic injury.  During the

October 22, 2010, telemedicine visit with Plaintiff, Dr. Paik noted that a physical examination of

Plaintiff's left foot revealed a moderate degree of soft tissue swelling as well as a "claw toe" deformity

of the left metatarsal with lateral deviation.  Dr. Paik's assessment during the October 22, 2010 visit

was that Plaintiff was status post dislocation and reduction of the 5th MP joint of the fifth toe on the

left foot, was experiencing recurrent subluxation of that joint, and that the patient had chronic foot

pain and multiple claw toe deformities of an unknown etiology.  Dr. Paik recommended open

reduction internal fixation ("ORIF") with K-Wires, which is a procedure used to fix Plaintiff's broken

fifth left toe using K-wires to hold the bones in place while healing.  He also recommended a partial

phalangectomy, a procedure to remove excess partial phalanges bones in the toes, to address Plaintiff's

other preexisting claw toe deformities.

It is further undisputed that after the telemedicine consult with Dr. Paik, Plaintiff saw NP Dhah again on November 4, 2010, who completed a physician request for services for Dr. Paik's recommended procedures.  NP Dhah also renewed Plaintiff's Tylenol 3 pain medication twice, first for one month, then again on November 19, 2010 for two months.  Dr. Clark approved Dr. Paik's recommended ORIF procedure on November 30, 2010.  Due to scheduling conflicts resulting in Dr. Paik's office cancelling the first appointment, Dr. Paik did not perform the procedure until January 5, 2011, at Mercy Hospital.

During the January 5, 2011 surgery, Dr. Paik performed a partial phalangectomy of the fifth toe, an anterior capsulotomy of the 5th MP joint, a lengthening of the extensor tendon of the fifth toe, and internal fixation with K-wire of the 5th MP joint followed by application of a short leg cast.  No intra-operative complications were encountered by Dr. Paik.  Plaintiff tolerated the January 5, 2011 procedure well and was transferred to the recovery room in satisfactory condition.

On January 24, 2011, Plaintiff was seen for a follow up with Dr. Paik, who reviewed the X-ray and noted that it "reveals no internal change compared to previous X-ray films," which meant that his fifth left toe was healing properly as anticipated.  During the January 24, 2011 visit, a window was cut in Plaintiff's cast so that Dr. Paik could adequately visualize the patient's surgical wound.  Dr. Paik removed the K-wires (used to hold the bones in place during the healing process) from his toe and stitches from Plaintiff's left foot cast, replaced the opening he had cut in the cast to inspect the wound, but left the cast on to continue the healing process.  There was no notation by Dr. Paik of any damage to the K-wires.  Dr. Paik instructed Plaintiff to return to his office for another follow up evaluation within one week so Dr. Paik could permanently remove the cast and start him on active passage range of motion exercises to alleviate the stiffness he was experiencing in his joints.

Plaintiff was not returned to Dr. Paik's office until nearly two months later on March 14, 2011.  Dr. Paik's examination notes of Plaintiff on March 14, 2011, after removal of his cast, indicate that the surgery site was healing well and was without signs of infection (i.e., no redness, no swelling, no purulent discharge, no malodor, etc.)  (Paik Decl. ¶ 6.)  Dr. Paik's recommended treatment plan, following the March 14, 2011 visit, was observation and passive stretching exercises to help improve Plaintiff's range of motion.  (William Brien Decl. ¶ 5(e), Ex. B at p. 15.)

There is no evidence before the Court that Dr. Paik was deliberately indifferent to Plaintiff's serious medical needs on January 5, 2011, January 24, 2011, and March 14, 2011.  Dr. Paik submits the declaration of Dr. William Brien, who after review of all the relevant information, provides an expert opinion that Dr. Paik met the applicable standard of care for the management of Plaintiff's left foot complaints, both before, during, and after the surgical procedure of January 5, 2011.  Dr. Brien further opines "that there was nothing that Dr. Paik either did or did not do that played a substantial factor, to a reasonable degree of medical probability, in the injuries and damages claimed by plaintiff in this lawsuit.  It definitely cannot be said that Dr. Paik was somehow deliberately indifferent to a serious medical need of [Plaintiff's] in connection with his care and treatment of the patient."  (ECF No. 39-5, William Brien Decl. ¶ 6.)  Dr. Brien's opinion is based on his education and experience in the field of Orthopedic Surgery, review of Plaintiff's medical records/office chart from Dr. Paik's medical group, and review of Plaintiff's complaint in the instant action.

Plaintiff argues that Dr. Paik fixed Plaintiff's 5th toe in a disclosed position and cites the evaluation prepared by Dr. Chaudhri on January 24, 2011. (ECF No. 50, Pl.'s Opp'n Ex. A at p. 10.) Dr. Chaudhri stated that "[a] K-wire is seen fixing the fracture and dislocation of the distal phalanx of the 5th toe, however on the lateral view, the distal phalanx appears dislocated dorsally and is fixed in that position.  There is a mild irregularity of the articular surface of the distal phalanx, but no fractures are noted."  (Id.)  There is no evidence before the Court to support the finding that the x-ray evaluation by Dr. Chaudhri on January 24, 2011, is inconsistent with the procedure performed by Dr. Paik on January 5, 2011, in order to repair Plaintiff's broken fifth left toe by using K-wires to hold the bones in place while healing, and partial phalangectomy to remove excess partial phalanges bones in the toes and to address Plaintiff's other preexisting claw toe deformities.  This is particularly so, given that Dr. Chaundhri's report noted no fractures and there was "no evidence of hardware failure or fracture in the K-wire which was still in place fixing the dislocated toe.  Furthermore, there is no showing that Plaintiff was in need of further surgery as a result of the surgery by Dr. Paik.  Indeed, at the follow up appointment on March 14, 2011, Dr. Paik examined Plaintiff's foot and noted that "the recurrent dislocation of his toe was caused by (e.g., 'secondary to') the 'intrinsic muscle and claw toe deformity,' which he believed was unrelated to any traumatic injury," and such finding appears

consistent with Dr. Chaundrhir's evaluation.  (Paik Decl. ¶¶ 7, 9, Ex. 4 at p. 2.)  Moreover, even if Dr. Chaundhir's evaluation is inconsistent with Dr. Paik's review on the same day, such evidence, at best, would demonstrate nothing more than a mere difference of opinion as to how to treat Plaintiff's broken toe.  See, e.g., Wilhelm v. Rotman, 680 F.3d at 1122 (physician who comes to different diagnosis not deliberately indifferent to plaintiff).  Neither difference of opinion, negligence, or medical malpractice can give rise to a constitutional violation of the Eighth Amendment.  Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).

Plaintiff's claim that Dr. Paik failed to prescribe proper antibiotics for an alleged infection after the removal of the cast is also not supported by any admissible evidence.  Dr. Brien opines that the standard of care only requires the prescription/administration of antibiotics following an operative procedure when there is some sort of objective indicator that an infectious process is ongoing.  (William Brien Decl. ¶ 6(f).)  In this case, Dr. Paik's notes and custom and practice clearly indicate that none of the hallmark signs or indications of an ongoing infectious process were present at Plaintiff's surgical site during any of the post-operative visits.  (Paik Decl. ¶ 5.)  Dr. Brien provides that one of the reasons the standard of care does not require the administration of a course of antibiotics absent some objective indicator of an ongoing infectious process is due to the increased occurrence of the development of antibiotic-resistant pathogens – so called "super bugs."  (William Brien Decl. ¶ 6(f).)  According to Dr. Brien, most reasonable practitioners are unwilling to order antibiotics on a prophylactic basis as the risks of doing so (i.e., the potential creation of antibiotic-resistance pathogens) are outweighed by the potential benefits (halting an infectious process that has not objectively manifested itself), especially when the administration of a course of antibiotics can be effectively initiated after the initial signs of an infectious process are first seen.  (William Brien Decl. ¶ 6(f).)

Dr. Brien opines that on March 14, 2011, when Plaintiff returned to Dr. Paik's office, Dr. Paik met the standard of care relating to the post-operative management and evaluation of Plaintiff.  (William Brien Decl. ¶ 6(e).)  Dr. Paik correctly removed Plaintiff's short leg cast, which had been present on the left lower extremity for a long enough period to serve its purpose in immobilizing the area that was operated upon to allow for non-movement of the toe and assist with the post-operative

1   healing process.  (William Brien Decl. ¶ 6(e).)  Dr. Paik also met the standard of care by further re-

2   examining the surgery site/wound, which he noted was healing well and was without signs of

3   infection.  (William Brien Decl. ¶ 6(e).)  Dr. Brien concludes that because this was charted by Dr.

4   Paik, there is no reason to assume that any infectious process was ongoing, as Dr. Paik's custom and

5   practice during that time frame would have been to note the presence of excessive swelling, redness, a

6   feeling of heat on palpation, purulent discharge, malodor, fever, etc. if it were present at time of

7   physical examination.  (William Brien Decl. ¶ 6(e); Paik Decl. ¶ 6.)

8       It is undisputed that on March 18, 2011, Plaintiff submitted a Health Care Services Request

9   Form, stating "I need a medication refill on my Tylenol #3 I get them twice a day two tablets.  Due to

10  an injury to my left foot that required surgery.  And after the surgery the cast was left on my foot for

11  44 days beyond the removal date.  This has caused me a great deal of pain in the foot."  (Clark. Decl.

12  Ex. A at p. 41.)  On March 21, 2011, NP Dhah responded to the request, examined Plaintiff's foot, and

13  noted that his "left foot scar healed without signs of infection" and that there were "several abrasions

14  to left foot without … erythema [inflammation]."  (Clark Decl. Ex. A at p. 42.)  The fact that Plaintiff

15  may have been prescribed Cephalexin (aka Keflex, an antibiotic) several weeks subsequent to the

16  removal of his cast does not establish that Dr. Paik was deliberately indifferent to Plaintiff's medical

17  needs on March 14, 2011, when the cast was removed.

18      In sum, based on the record before the Court, Plaintiff has received appropriate medical

19  treatment from Dr. Paik who established a course of treatment, including surgery that he believed to be

20  appropriate.  The details set forth in Dr. Paik's medical notes during and following the surgery

21  contradict Plaintiff's subjective belief that Dr. Paik was deliberately indifferent to his medical needs.

22  Accordingly, Dr. Paik is entitled to summary judgment and his motion should be granted.[27]

23  ///

24  ///

25  ///

26

27  _____

[27]  Because the Court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether Dr. Paik was
deliberately indifferent to his medical needs, the Court need not reach Defendant's alternative argument of lack of

28  causation.

## II.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendant Clark and Gray's motion for summary judgment is GRANTED in part and DENIED in part as follows:

     a.      Summary judgment is GRANTED in favor of Defendants Clark on Plaintiff's that he delayed issuance of crutches;

     b.      Summary judgment is GRANTED in favor of Defendant Clark on Plaintiff's claim that he delayed treatment or emergency transport for the fall and re-injury of his foot;

     c.      Summary judgment is DENIED as to Plaintiff's claim that Defendants Clark and Gray refused to provide Plaintiff a dosage of Morphine and refused to act on Plaintiff's call of "man down";

     d.      Summary judgment is DENIED as to Plaintiff's claim that Defendant Clark delayed in providing a follow-up appointment with Dr. Paik;

     e.      Summary judgment is GRANTED as to Plaintiff's claim that Defendant Clark failed to treat Plaintiff's foot infection following removal of the foot cast;

     f.      Defendant Gray is not entitled to qualified immunity;

2.      Defendant Paik's motion for summary judgment is GRANTED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and

*//*

*//*

*//*

*//*

*//*

Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 24, 2015**

UNITED STATES MAGISTRATE JUDGE

38